## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

ESTATE OF MARTHA BAROTZ, by its
Executor Nathan Barotz,

      Plaintiff,

      v.

WILMINGTON SAVINGS FUND
SOCIETY, FSB; WELLS FARGO
DELAWARE TRUST COMPANY, N.A.;
WELLS FARGO BANK, N.A.; APOLLO
GLOBAL MANAGEMENT, INC.;
APOLLO ASSET MANAGEMENT, INC.;
APOLLO CAPITAL MANAGEMENT,
L.P.; and FINANCIAL CREDIT
INVESTMENT I MANAGER, LLC,

      Defendants.

C.A. No. 2024-0447-JTL

## OPINION GRANTING MOTIONS TO DISMISS IN PART

Date Submitted: March 20, 2026
Date Decided: June 29, 2026

Kaan Ekiner, Nathan D. Barillo, COZEN O'CONNOR, Wilmington, Delaware; Gregory J. Star, Michael J. Miller, Victoria G. Mazzola, Carlynne A. Wagner, COZEN O'CONNOR, Philadelphia, Pennsylvania; *Attorneys for Plaintiff.*

Steven L. Caponi, Michael J. Vail, K&L GATES LLP, Wilmington, Delaware; *Attorneys for Defendant Wilmington Savings Fund Society, FSB.*

Kevin J. Mangan, Stephanie S. Riley, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware; Mahesh Venkatakrishnan Parlikad, Kelly A. Carrero, JONES DAY, New York, New York; *Attorneys for Defendants Wells Fargo Delaware Trust Company, N.A. and Wells Fargo Bank, N.A.*

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Gregory F. Laufer, Jacobus J. Schutte, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys for Defendants Apollo Global Management, Inc., Apollo Asset Management, Inc., Apollo Capital Management, L.P., and Financial Credit Investment I Manager, LLC.*

**LASTER, V.C.**

Nearly twenty years ago, a life settlement company affiliated with a major financial institution paid a senior citizen to engage in a stranger-originated life insurance ("STOLI") transaction. The senior citizen procured a multi-million-dollar policy on her own life in exchange for a payment equal to three percent of the stated death benefit. As instructed by the life settlement company, she formed an insurance trust with a corporate trustee and made the life settlement company the sole owner of the beneficiary interest (the "Insurance Trust"). The Insurance Trust was a directed trust, meaning its corporate trustee was entitled to follow the instructions of the life settlement company as sole owner of the beneficiary interest. The life settlement company instructed the corporate trustee to apply for and secure the policy. The life settlement company paid the premiums to maintain the policy.

Five years later, a private equity firm acquired the beneficiary interest in the Insurance Trust when it bought a portfolio of life insurance investments from the financial institution affiliated with the life settlement company. The private equity firm controlled the beneficiary interest in the Insurance Trust through a three entity stack. At the top was an Irish entity managed by an affiliate of the private equity firm. That entity held the beneficiary interest in a Delaware statutory trust, which in turn held the beneficiary interest in another statutory trust, which in turn held the beneficiary interest in the Insurance Trust. The two Delaware trusts sitting between the Insurance Trust and the Irish entity were directed trusts, meaning each trustee followed the instructions of the sole owner of the beneficiary interest. The private equity firm thus controlled the structure all the way down.

Twelve years after the insurance policy was issued, the senior citizen died. The private equity firm caused the trustee of the Insurance Trust to apply for the death benefit, which the insurance company paid to the Insurance Trust. As directed by the private equity firm, each trustee in the stack distributed the death benefit proceeds to the next entity in line. The trustee of the third trust transferred the proceeds to a bank account controlled by the private equity firm. The three intervening entities between the insurance trust and the private equity firm subsequently dissolved.

STOLI transactions violate Delaware law and are void ab initio. Delaware's insurance code gives the estate of the insured a right to recover the death benefit from a person who received it (the "Disgorgement Statute"). When the senior citizen's estate began to investigate the scheme at the center of this case, the Insurance Trust sued the estate in New York state court to obtain a declaratory judgment of non-ownership. The estate sued the Insurance Trust in Delaware Superior Court.

The New York court dismissed its action in favor of the Delaware proceeding. The Superior Court ultimately granted summary judgment for the estate and against the Insurance Trust. But when the estate sought to enforce the judgment, the Insurance Trust claimed to be insolvent. Through discovery in aid of execution, the estate learned more about the flow of the insurance proceeds.

In 2024, the estate filed this action. The estate has sued the trustee of the Insurance Trust, the trustees of the first two intervening trusts, and the private equity firm and three of its affiliates. The estate contends each of the defendants is liable for the death benefit under the Disgorgement Statute. The estate also asserts

2

that the defendants engaged in fraudulent transfers, improperly dissolved the first two intervening entities by failing to make provision for known claims, and committed fraud.

The defendants moved to dismiss. They argue that the complaint fails to state any claims on which relief can be granted. They also argue that the estate improperly split its claims, lacks standing, and sued too late.

This decision grants defendants' motions to dismiss in part. Three claims fail on timeliness grounds:

- The estate's claims under the Disgorgement Statute are subject to a three-year statute of limitations. The estate was on inquiry notice of its claims by February 2021, but did not sue until April 2024.

- The estate's claim for constructive fraudulent transfer is untimely because the challenged transfers occurred in 2019 and the statute of limitations is not subject to tolling. The estate did not sue until April 2024.

- The estate's claim for actual fraudulent transfer is untimely because the challenged transfers were or could reasonably have been discovered by the estate in 2021. Again, the estate did not sue until April 2024.

The estate's fraud claim fails because that claim is really an effort to plead fraudulent concealment to defeat the defendants' timeliness defenses. On the alleged facts, the estate cannot transform allegations about fraudulent concealment into a timely fraud claim.

That leaves the estate's claim for improper dissolution of the first two intervening entities. That claim survives. So does a veil-piercing claim that none of the defendants challenged.

## I.    FACTUAL BACKGROUND

The facts are drawn from the operative complaint (the "Complaint"), documents integral to the Complaint or that the Complaint incorporates by reference, and documents subject to judicial notice.[1] At this procedural stage, the court must credit the Complaint's well-pled allegations and draw all reasonable inferences in the plaintiff's favor.

### A.    The STOLI Transaction

In 2006, Martha Barotz entered into a STOLI transaction with an entity called Life Accumulation Trust III (the "Life Settlement Company"). Deutsche Bank, the multinational financial firm, beneficially owned and controlled the Life Settlement

---

[1] Citations in the form "Compl. ¶ ___" refer to the paragraphs of the operative complaint. Dkt. 104. Citations in the form "Compl. Ex. ___ at ___" refer to the exhibits to the Complaint. *Id.* Citations in the form "WSFS OB Ex. ___ at ___" refer to the exhibits to Defendant Wilmington Savings Fund Society, FSB's Opening Brief in Support of its Motion to Dismiss the Verified Amended Complaint. Dkt. 115. Citations in the form "Wells Fargo OB Ex. ___ at ___" refer to the exhibits submitted by Defendants Wells Fargo Bank, N.A. and Wells Fargo Delaware Trust Company, N.A. in support of their Opening Brief in Support of Their Motion to Dismiss the Verified Amended Complaint. Dkt. 118. Citations in the form "AB at ___" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint. Dkt. 146. Citations in the form "Wells Fargo RB at ___" refer to Defendants Wells Fargo Bank, N.A.'s and Wells Fargo Delaware Trust Company, N.A.'s Reply Brief in Support of Their Motion to Dismiss the Verified Amended Complaint. Dkt. 151. Citations in the form "Plaintiff's Supp. OB at ___" refer to Plaintiff's Supplemental Brief in Opposition to Defendants' Motions to Dismiss Plaintiff's First Amended Complaint. Dkt. 168. Citations in the form "Plaintiff's Supp. RB at ___" refer to Plaintiff's Reply to Defendants' Supplemental Brief in Support of Their Motions to Dismiss Plaintiff's First Amended Complaint. Dkt. 172. Page references cite internal pagination whenever possible.

Company. The transaction employed a well-known template frequently used in the STOLI industry.

Acting on instructions from the Life Settlement Company, Barotz set up the Insurance Trust, formally known as the Martha Barotz 2006-1 Insurance Trust, under a trust agreement dated August 18, 2006. The Life Settlement Company became the sole owner of the Insurance Trust's beneficiary interest in exchange for a nominal capital investment in the Insurance Trust. The Life Settlement Company thus became the sole beneficiary of the Insurance Trust, but because the beneficiary interest was transferrable, the Life Settlement Company could transfer the interest to a new owner.

The Insurance Trust was originally a Delaware statutory trust formed under the Delaware Statutory Trust Act. Effective March 18, 2021, the Insurance Trust converted to a common-law trust.

The initial trustee of the Insurance Trust was Christiana Bank & Trust Company. Wilmington Savings Fund Society, FSB ("WSFS") took over as the successor trustee after acquiring the original trustee. The trust agreement for the Insurance Trust established a directed trustee structure, meaning that the trustee had to follow the instructions given by the owner of the beneficiary interest.

On August 23, 2006, the Life Settlement Company caused the Insurance Trust to apply for a $5 million insurance policy on Barotz's life. On September 3, an insurance company issued a policy to the Insurance Trust with a stated death benefit of $5 million (the "Policy"). Except for the nominal investment that the Life

5

Settlement Company made in the Insurance Trust in return for the beneficiary interest, the Insurance Trust had no assets other than the Policy.

The Life Settlement Company paid Barotz $150,000 for her role in the STOLI transaction. That amount represented 3% of the death benefit. Barotz did not pay any premiums on the Policy. Going forward, the Life Settlement Company funded the premiums.

## B.     The First Sale

Deutsche Bank included the beneficiary interest in the Insurance Trust in a portfolio of life insurance investments that it sold to an affiliate of Apollo Global Management, Inc. ("Apollo Global") for $200 million in February 2011. Apollo Global is a publicly traded Delaware corporation and private equity firm.

Apollo Global owned the beneficiary interest in the Insurance Trust through a series of subsidiaries. One level down from Apollo Global was Apollo Asset Management, Inc. ("Apollo Asset"), a Delaware corporation and wholly owned subsidiary of Apollo Global. One level down from Apollo Asset were three subsidiaries: (i) Apollo Capital Management, L.P. ("Apollo Capital"), a Delaware limited partnership, (ii) Financial Credit Investment I, L.P., a Cayman entity (the "Cayman Fund"), and (iii) Financial Credit Investment I Manager, LLC (the "Fund Manager"), a Delaware limited liability company. Apollo Capital was the sole member of the Fund Manager.

One level down from the three subsidiaries was Financial Credit Investment I Limited, an Irish entity (the "Investment Fund"). Apollo Capital, the Cayman Fund, and the Fund Manager owned 100% of the equity interest in the Investment Fund.

6

Through the Fund Manager, Apollo Capital managed the Investment Fund. This decision refers to Apollo Global, Apollo Asset, Apollo Capital, and the Fund Manager collectively as the Apollo Defendants.

The Apollo Defendants established three Delaware statutory trusts to hold and manage the portfolio of life insurance investments they acquired from Deutsche Bank. They were Financial Credit Investment I Trust C-2 ("Trust C-2"), Financial Credit Investment I Trust C-3 ("Trust C-3"), and Financial Credit Investment I Trust C-4 ("Trust C-4").

The Investment Fund owned the beneficiary interest in Trust C-2. Wells Fargo Delaware Trust Company, N.A. ("Wells Fargo Delaware") served as the trustee for Trust C-2. Trust C-2 owned the beneficiary interest in Trust C-3. Wells Fargo Delaware served as the trustee for Trust C-3. Wells Fargo Bank, N.A. ("Wells Fargo Bank"), the parent company of Wells Fargo Delaware, served as a secondary trustee and securities intermediary for Trust C-3. This decision refers to Wells Fargo Delaware and Wells Fargo Bank together as the Wells Fargo Defendants.

In April 2011, as part of the portfolio sale, the Life Settlement Company transferred the beneficiary interest in the Insurance Trust to Trust C-3. Because the Insurance Trust continued to own the Policy, that transfer made the Apollo Defendants the economic beneficiaries of the Policy. After acquiring the beneficiary interest in the Insurance Trust, Trust C-3 paid the premiums on the Policy until Barotz's death.

Both Trust C-2 and Trust C-3 were directed trusts, meaning that their trust instruments required that the trustee follow the instructions of the owner of the beneficiary interest. Recall that the Insurance Trust was also a directed trust. The trustee of the Insurance Trust (WSFS) therefore had to follow the instructions of Trust C-3, whose trustee (Wells Fargo Delaware) had to follow the instructions of Trust C-2, whose trustee (Wells Fargo Delaware) had to follow the instructions of the Investment Fund, which was managed, through the Fund Manager, by Apollo Capital. Through this structure, the Apollo Defendants controlled all of the entities in the ownership chain.

## C.     The Death Benefit Distribution

Barotz died on December 22, 2018. The Apollo Defendants learned of her death on December 26. As early as January 2, 2019, the Apollo Defendants had started the process for securing the death benefit, which included authorizing and assisting in preparing the paperwork necessary to file a claim.

By February 2019, Trust C-3 had directed WSFS in its capacity as trustee of the Insurance Trust to submit a death benefit claim to the insurer. On April 4, 2019, the insurer sent a check for $5,042,328.77 to WSFS (the "Death Benefit"). WSFS deposited the check in an account WSFS maintained in the name of the Insurance Trust.

On April 12, 2019, Trust C-3 instructed WSFS to transfer the Death Benefit to a Wells Fargo Bank account titled "Wells Fargo Longevity Clearing Account" for

"further credit" to an account titled "FCI I Trust C-3 Proceeds Account."[2] Apollo Capital received consolidated statements that included this account. On April 18, WSFS complied.

On April 22, 2019, representatives of the Apollo Defendants engaged in internal discussions about obtaining the Death Benefit. On April 24, Wells Fargo Bank transferred the Death Benefit to a JPMorgan account in the name of the Investment Fund. The Apollo Defendants intended to use some of the proceeds to pay expenses.

Soon thereafter, several multi-million dollar withdrawals were made from the JPMorgan account. The funds were deposited into another JPMorgan account in the name of the Cayman Fund.

## D.    The Second Sale

Soon after the distribution of the Death Benefit, the Apollo Defendants caused the Investment Fund to sell a portfolio of beneficiary interests in around 530 active life insurance policies—comprising death benefits totaling $1.46 billion—to Berkshire Hathaway and a different Apollo Global affiliate called Financial Credit Investment III DAC. As part of that transaction, the Apollo Defendants directed the trustees of Trust C-2 and Trust C-3 to dissolve those entities.

The Apollo Defendants documented the instruction to dissolve Trust C-2 and Trust C-3 in an Omnibus Termination Agreement and Direction, dated December 2,

---

[2] Compl. ¶ 77.

2019 (the "Termination Agreement"). As part of that agreement, the Investment Fund

> certifie[d] and agree[d] that (a) all claims and obligations of the Trusts, if any, have been paid in full as of the date hereof or reasonable provision has been made by the Beneficial Owner for the payment of such claims and obligations as required by Section 3808(e) of the Act, and (b) as of the date hereof and aside from any Tax Filings, the winding up of the affairs of the Trusts under the Trust Agreements will have been completed and accordingly all conditions to the dissolution and termination of the Trusts under the Trust Agreements will have been satisfied.[3]

That provision was a contractual stipulation intended to protect the trustees. If it turned out not to be true, then the trustees could sue. It did not establish the truth of the stipulation as a real-world fact.

By late January 2020, the dissolutions of Trust C-2 and Trust C-3 were complete. The Apollo Defendants later dissolved the Investment Fund, and its liquidation and winding up were complete by June 6, 2021. Those steps left the Insurance Trust as the only active entity in the chain of ownership linking the original Policy to the Apollo Defendants that received the Death Benefit.

### E. The Estate's Investigation

Barotz's spouse was the executor of her estate (the "Estate"). He had been part of the original STOLI transaction, where he signed documents for the Insurance Trust as the settlor's spouse. Their son later succeeded his father as the executor of the Estate. He notarized the documents for the original STOLI transaction. Nor was

---

[3] *Id*. ¶ 148; *see* Compl. Ex. N § 1(b).

10

the STOLI transaction Barotz's only venture of that sort. She participated in at least one other STOLI scheme, which was the subject of a separate litigation in the Delaware Superior Court.[4]

Because he had been part of the original STOLI transaction, the executor knew about the Insurance Trust, but little more. He suspected that the Life Settlement Company had transferred the beneficiary interest in the Insurance Trust, but did not know where it ended up. He also did not know the fate of the Policy or the Death Benefit.

As part of an investigation into whether the Estate had claims under Delaware law, the Estate's counsel sent letters in January 2020 to a number of known STOLI players, including Wells Fargo Bank. The letters asked about the "final recipient of the death benefit" and suggested that the Estate intended to commence litigation to recover the Death Benefit, if necessary.[5]

On January 28, 2020, Wells Fargo Bank forwarded the Estate's letter to the Apollo Defendants. Wells Fargo Bank reminded the Apollo Defendants that Trust C-3 held the beneficiary interest in the Policy. Wells Fargo Bank did not respond to the Estate's letter.

---

[4] *See Est. of Martha Barotz v. Vida Longevity Fund, L.P.*, C.A. No. N20C-05-144 EMD (CCLD) (Del. Super. Ct.).

[5] Compl. ¶ 64.

11

**F.     The New York Action**

On March 10, 2020, the Insurance Trust sued the Estate in New York state court using a procedural device known as a non-detailed summons (the "New York Action"). The summons alleged that the Insurance Trust remained the owner of the Policy at the time of Barotz's death and that the Insurance Trust "received" the Death Benefit.[6] The Insurance Trust sought a declaration that the Estate could not "maintain an action to recover … the proceeds of the Policy" from the Insurance Trust.[7] Strikingly, the Insurance Trust also sought damages for harm the Estate somehow caused the Insurance Trust.

The summons was the first time that the Estate learned that the Insurance Trust had in fact received the Death Benefit. The summons did not reveal that the Insurance Trust no longer held the Death Benefit or where the proceeds had gone. The summons also did not identify the owner of the beneficiary interest in the Insurance Trust or any of the entities further up the chain.

**G.     The Superior Court Action**

On April 15, 2020, the Estate sued the Insurance Trust in Delaware Superior Court (the "Superior Court Action"). The Estate invoked the Disgorgement Statute and sought to recover the Death Benefit from the Insurance Trust on the grounds that the Policy was an illegal STOLI transaction.

---

[6] *Id.* ¶ 56.

[7] *Id.*

12

On June 22, 2020, the Insurance Trust filed a formal complaint against the Estate in the New York Action. The complaint continued to seek a declaratory judgment addressing whether the Estate could "recover the Policy proceeds" from the Insurance Trust.[8] The complaint added detail about the original STOLI transaction but did not identify the owner of the Insurance Trust's beneficiary interest or explain what happened to the Death Benefit.

On July 22, 2020, the Insurance Trust moved to dismiss or stay in the Superior Court Action in deference to the New York Action. The motion explained that the Insurance Trust paid the premiums on the Policy and received the Death Benefit, but did not identify the owner of the beneficiary interest in the Insurance Trust or address whether the Insurance Trust had transferred the Death Benefit.

On the same day, the Estate moved to dismiss the complaint in the New York Action. The Insurance Trust opposed the motion. Its papers acknowledged that the Estate had tried to identify the owner of the Insurance Trust's beneficiary interest through the Estate's January 2020 letter.

The New York Court eventually dismissed the New York Action in favor of the Superior Court Action. Two days later, the Delaware Superior Court denied the Insurance Trust's motion to dismiss the Superior Court Action.

---

[8] *Id.* ¶ 61.

13

**H.    Discovery In The Superior Court Action**

The Estate served requests for the production of documents, requests for admission, and interrogatories in the Superior Court Action. When the Insurance Trust responded to the requests for production of documents in August 2020, the Insurance Trust objected to the relevance of the Estate's request for "documents sufficient to identify any and all of the persons or entities that were, at any time, the ultimate beneficiary(ies) of the Policy and/or of the [Insurance] Trust."[9] When the Insurance Trust produced documents in September 2020, the production included a Beneficial Interest Transfer Agreement dated April 14, 2011. That agreement evidenced the Life Settlement Company's sale of the beneficiary interest in the Insurance Trust to Trust C-3. Through this document, the Estate learned that Trust C-3 owned the beneficiary interest when the Death Benefit was paid. On October 30, 2020, the Estate issued a subpoena to Trust C-3.

Also in October 2020, the Insurance Trust responded to the Estate's requests for admission. The Insurance Trust admitted knowing that the Policy was part of a STOLI transaction and that the Insurance Trust was created in furtherance of a STOLI scheme.

In December 2020, the Insurance Trust responded to the Estate's interrogatories. One interrogatory asked the Insurance Trust to identify "any person

---

[9] *Id*. ¶ 66.

14

or entity who received all or part of the death benefit of the $5 million dollar policy."[10] The response only identified the Insurance Trust.

Despite the limited information that the Estate had obtained, the Estate "suspected that the [Insurance] Trust had transferred the Policy's death benefit to Trust C-3."[11] The Estate also suspected "that Trust C-3, as the beneficiary of the [Insurance] Trust, was in possession of the proceeds and would be the entity that would ultimately satisfy any judgment in favor of the Estate."[12] On January 25, 2021, in a filing in the Superior Court Action, the Estate stated that "[i]f the [Insurance] Trust ever, in fact, possessed the life insurance proceeds at issue in this action, it was only fleetingly as the funds flowed through it to the real party in interest."[13]

On January 27, 2021, the Estate proposed to add Trust C-3 as a defendant in the Superior Court Action. Counsel for the Insurance Trust responded that Trust C-3 dissolved in late January 2020. On January 29, 2021, the Insurance Trust produced more documents, including a wire transfer form indicating that the Insurance Trust transferred the Death Benefit to a bank account associated with Trust C-3 on April 18, 2019.

---

[10] *Id.* ¶ 70.

[11] *Id.* ¶ 71.

[12] *Id.*

[13] WSFS OB Ex. J at 2–3.

15

On February 2, 2021, the Estate issued subpoenas to the Fund Manager and Apollo Management, L.P. ("Apollo Management"). The subpoenas sought documents related to the Death Benefit and the dissolution of Trust C-3. The Fund Manager and Apollo Management objected to the subpoenas on the basis of relevance and burden, claiming that the information sought was irrelevant to the Superior Court Action.

The Estate did not move to enforce the subpoenas or engage with the subpoenaed parties. Instead, the Estate moved to compel the Insurance Trust to produce discovery identifying the recipients of the Death Benefit after Trust C-3's dissolution. The Insurance Trust claimed not to know who received the proceeds.

On April 27, 2021, the Insurance Trust produced a Removal, Appointment and Succession Agreement between WSFS, the Investment Fund, and an entity called 66 LLC. That agreement recited that the Investment Fund was in the "final stage" of a "voluntary liquidation" and that the Investment Fund was removing WSFS as trustee of the Insurance Trust, appointing 66 LLC as the new trustee, and converting the Insurance Trust to a common-law trust.[14] During a deposition two days later, a WSFS representative could provide no information beyond what was in the agreement.

## I.  Summary Judgment In The Superior Court Action

On May 4, 2021, the Estate moved for summary judgment against the Insurance Trust. The Superior Court granted the Estate's motion on December 18, 2023. On January 8, 2024, the Superior Court entered a final judgment awarding the

---

[14] Compl. ¶ 87.

16

Estate $6,922,036.86 in damages and prejudgment interest. The Insurance Trust did not appeal.

The Insurance Trust failed to satisfy the judgment, prompting the Estate to seek discovery in aid of execution. The Estate issued subpoenas to at least seventeen non-parties, including the Fund Manager, Trust C-4, other Apollo Global-affiliated entities, Wells Fargo Delaware, Wells Fargo Bank, WSFS, 66 LLC, and counsel for the Insurance Trust. The Estate also served requests for production and interrogatories on the Insurance Trust. The Estate subsequently moved to compel production and enforce the subpoenas.

On March 22, 2024, the Estate received a small production of documents from a few of the subpoenaed parties. According to the Estate, the discovery showed that the Investment Fund and the various trusts "were, in reality, a conglomerate of shell entities and empty statutory trusts that served as puppets for the ultimate director and financial beneficiary who sits behind the curtain pulling the strings: Apollo."[15]

The production included a Management Agreement showing that as of January 5, 2011, the Fund Manager managed the Investment Fund "to the fullest extent permitted by law."[16] The Management Agreement identified Apollo Capital as the sole member of the Fund Manager and a Co-President of Apollo Asset as the "Control

---

[15] *Id*. ¶ 114.

[16] *Id*. ¶ 116.

Person" of the Fund Manager.[17] The production also included an Amended Management Agreement, dated February 15, 2011, that expanded the Fund Manager's control over the Investment Fund. That Amended Management Agreement described the Fund Manager as an affiliate of Apollo Capital.

On March 25, 2024, counsel for the Insurance Trust moved to withdraw, representing that there had been no communication "with the Trustee or any authorized representative" of the Insurance Trust "concerning the Trust's response to any document or motion, any potential appeal in this Action, or any other legal services on behalf of the Trust."[18] The Estate opposed the motion.

On April 15, 2024, the Superior Court ordered the Insurance Trust to serve meaningful responses to the Estate's post-judgment discovery. The Superior Court also ordered counsel for the Insurance Trust to identify the addressee of their legal bills.

The Superior Court also granted the motions to enforce the subpoenas that the Estate had served, ordering the respondents to produce "any documents" relating to the formation and dissolution of the trusts involved with the Policy and the disposition of the Death Benefit.[19] In response, the Estate received a single document.

---

[17] *Id.* ¶ 117.

[18] *Id.* ¶ 101.

[19] *Id.* ¶ 103.

According to the Estate, "it was so heavily redacted that the Estate could not comprehend it."[20]

## J.     This Action

The Estate filed this action on April 26, 2024. The operative complaint contains seven counts:

- Count I asserts a claim against WSFS under the Disgorgement Statute.

- Count II asserts a claim against the Wells Fargo Defendants under the Disgorgement Statute.

- Count III asserts a claim against the Apollo Defendants under the Disgorgement Statute.

- Count IV asserts a claim against the Wells Fargo Defendants for improperly dissolving Trust C-2 and Trust C-3.

- Count V asserts a claim to enforce the Superior Court judgment against the Apollo Defendants under an alter ego or veil piercing theory.

- Count VI asserts a claim against all defendants for fraudulent transfer.

- Count VII asserts a claim against all defendants for fraud.

WSFS and the Wells Fargo Defendants (the "Trustees") moved to dismiss all claims against them. The Apollo Defendants moved to dismiss Counts III, VI, and VII. The Apollo Defendants did not move to dismiss Count V.

## II.     LEGAL ANALYSIS

When considering a motion to dismiss under Rule 12(b)(6), "a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant

---

[20] *Id.* ¶ 104.

19

notice of the claim, [and] draw all reasonable inferences in favor of the plaintiff."[21] The court should "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[22] Delaware's "governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'"[23]

"For a court to grant a Rule 12(b)(6) motion on timeliness grounds, the complaint's allegations must show that the claim was filed too late."[24] When evaluating whether the factual allegations in a complaint support a timeliness defense, a court "must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis."[25] When reviewing a timeliness defense, the "court effectively assumes the validity of the claims, then applies timeliness principles."[26]

## A. Counts I, II, and III: The Disgorgement Statute Claims

Counts I, II, and III of the Complaint assert claims under the Disgorgement Statute. The Trustees seek dismissal for lack of standing. All the defendants seek

---

[21] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[22] *Id.*

[23] *Id.* at 537 n.13.

[24] *Lebanon Cty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1193 (Del. Ch. 2022) (citing *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993)).

[25] *State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524–25 (Del. Ch. 2005).

[26] *Collis*, 287 A.3d at 1193.

dismissal on the theory that the claims are untimely. Assessing the defendants' arguments for dismissal requires a baseline understanding of the law on those claims.

Wagering on human life has long been illegal, regardless of the means. "Since the initial creation of life insurance during the sixteenth century, speculators have sought to use insurance to wager on the lives of strangers."[27] In 1881, the Supreme Court of the United States recognized the insurable interest doctrine, under which the person procuring a life insurance policy must have a sufficient interest in the ongoing life of the insured to prevent the policy from operating as a death wager.[28] As the Court acknowledged, it is hard to define an insurable interest "with precision," but explained that the doctrine required an interest "founded upon the relations of the parties to each other, either pecuniary or of blood or affinity," that made it reasonable for the person procuring the policy "to expect some benefit or advantage from the continuance of the life of the assured."[29] In other words, the person securing the policy had to have some connection to the insured that would give the person securing the policy a reason to want the insured to continue living. In that setting, the person securing the policy can legitimately secure a death benefit as compensation for the loss—emotional, pecuniary, or otherwise—that the insured's death will cause.

---

[27] *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Tr.*, 28 A.3d 1059, 1069 (Del. 2011).

[28] *See Warnock v. Davis*, 104 U.S. 775, 779 (1881).

[29] *Id.*

The Delaware Supreme Court adopted the insurable interest doctrine in 1915.[30] In 1968, the Delaware General Assembly codified the doctrine in Section 2704(a) of the Insurance Code (the "Insurable Interest Statute")."[31] The pertinent language states:

> Any individual of competent legal capacity may procure or effect an insurance contract upon that individual's own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or that individual's personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.[32]

The provision has two parts. By its terms, a person may procure insurance on his own life for anyone's benefit. But a person procuring insurance on the life of another must have an insurable interest in the life of the insured.[33]

One common structure in the life insurance industry involves the creation of a life insurance trust to own a policy, receive the proceeds, and then distribute them in accordance with the trust agreement. A trust is a separate jural entity, so questions could arise as to whether the trust was procuring a policy on the life of another. Delaware law first addressed this issue by statute in 1994 (the "Trust Exception"). Today, the pertinent language states:

---

[30] *See Baltimore Life Ins. Co. v. Floyd*, 94 A. 515, 520 (Del. 1915).

[31] 18 *Del. C.* § 2704(a).

[32] *Id.*

[33] *See Price Dawe*, 28 A.3d at 1073–74.

22

The trustee of a trust created and initially funded by an individual has an insurable interest in the life of that individual and the same insurable interest in the life of any other individual as does any person who is treated as the owner of such trust for federal income tax purposes without regard to:

a. The identity of the trust beneficiaries;

b. Whether the identity of the trust beneficiaries changes from time to time; and

c. The means by which any trust beneficiary acquires a beneficial interest in the trust.[34]

Under the Trust Exception, if a person with an insurable interest validly creates and initially funds a trust to own the policy, then the trustee has an insurable interest in the life of the insured sufficient to support the policy

Today, the Disgorgement Statute appears in Section 2704(b) of the Insurance Code. It states:

If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or the individual's executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.[35]

The Disgorgement Statute thus provides that if the person procuring a policy lacks an insurable interest in the life of the insured, then the insured or their personal representative can recover the death benefit from a person who received it.

---

[34] 18 *Del. C.* § 2704(c)(5).

[35] 18 *Del. C.* § 2704(b).

A STOLI transaction violates the Insurable Interest Statute. By definition, a stranger to the insured lacks an insurable interest in the insured's life and cannot procure a life insurance policy.

But what about more subtle fact patterns? In *Price Dawe*, the Delaware Supreme Court addressed a situation where—as here—a person procured an insurance policy on his own life. As here, the insured designated a family trust as the policy beneficiary, and he owned the beneficiary interest in the trust. Shortly after procuring the policy, the insured sold it to an investor. When his estate sought to recover the policy, the party who received the death benefit argued that the structure complied with the Insurance Code. The justices disagreed, explaining the statute "requires more than just technical compliance."[36] As they explained, "a third party cannot use the insured as a means or instrumentality to procure a policy that, when issued, would otherwise lack an insurable interest."[37]

The justices further explained that when a person with an insurable interest nominally procures a policy, but another person pays the premium, then the validity of the transaction turns on whether the person paying the premium had an insurable interest in the life of the insured.[38] "If the funding is provided by a third party as part

---

[36] *Price Dawe*, 28 A.3d at 1074.

[37] *Id.*

[38] *See id.* at 1076 ("[T]he insured's subjective intent for procuring a life insurance policy is not the relevant inquiry. The relevant inquiry is who procured the policy and whether or not that person meets the insurable interest requirements.").

of a pre-negotiated agreement—then the substantive requirements of [the Insurable Interest Statute] are not met."[39] That analysis flows through to the Trust Exception. If a third party provides the funding for an insurance trust as part of a pre-negotiated agreement, then the transaction violates the Insurable Interest Statute.

This case maps onto *Price Dawe*. As the Superior Court already held, the Policy violated the Insurable Interest Statute, and the Estate is entitled to the Death Benefit under the Disgorgement Statute. The problem is the Insurance Trust distributed the proceeds long ago. The Estate therefore now asserts a claim under the Disgorgement Statute against the Trustees and the Apollo Defendants.

### 1. Constitutional Standing

The Trustees argue that the Estate lacks constitutional standing to sue because the Estate falls outside the zone of interests that the Insurable Interest Statute and Disgorgement Statute seek to protect. The court must address standing first, because "standing is a threshold question" that ensures the case presents an appropriate dispute for the exercise of the court's judicial power.[40] Contrary to the Trustees' assertions, the Estate is precisely the type of party that the Insurable Interest Statute and Disgorgement Statute seek to protect and grant standing to sue.

---

[39] *Id.* at 1078.

[40] *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

25

"The term 'standing' refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance."[41] Standing "is concerned only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter of the controversy."[42]

Federal courts have developed an extensive body of standing jurisprudence that interprets Article III of the United States Constitution as a constraint on the scope of federal judicial power. "Delaware courts are not bound by the federal rules of justiciability."[43] Unlike the federal courts, "state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"[44] State courts nevertheless often look to federal precedent as persuasive authority.[45]

"To establish standing, a plaintiff or petitioner must demonstrate first, that he or she sustained an 'injury-in-fact'; and second, that the interests he or she seeks to

---

[41] *Id.* (citing *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991)).

[42] *Stuart Kingston*, 596 A.2d at 1382 (emphasis in original).

[43] *Albence v. Higgin*, 295 A.3d 1065, 1086 (Del. 2022) (citing *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) ("We have recognized often that the constraints of Article III do not apply to state courts, and accordingly the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability[.]")).

[44] *Dover Hist. Soc'y*, 838 A.2d at 1111 (quoting *Stuart Kingston*, 596 A.2d at 1382).

[45] *Id.* (noting that the standards for evaluating standing under federal law "are generally the same as the standards for determining standing to bring a case or controversy within the courts of Delaware.").

26

be protected are within the zone of interests to be protected."[46] The injury requirement is multifaceted:

> (1) the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
>
> (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and
>
> (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[47]

The Estate has met those requirements.

First, the Estate suffered an injury. The Disgorgement Statute gives the insured's estate a right to recover a death benefit from a STOLI policy.[48] Barotz died, yet the Estate did not receive the Death Benefit.

Second, a direct causal connection exists between the conduct the Estate attacks and the injury. Rather than the Estate receiving the Death Benefit, the defendants routed the Death Benefit through a series of entities to end up in the Apollo Defendants' accounts. That result is fairly traceable to the defendants' conduct and is not the result of independent action by some third party.

---

[46] *Id.* at 1110.

[47] *Id.* (quoting *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175–76 (3d Cir. 2000)).

[48] 18 *Del. C.* § 2704(b).

Third, a favorable decision in this action will redress the injury. If the Estate recovers an amount equal to the Death Benefit plus interest, it will be made whole.

Last, the Estate falls within the zone of interests that the Disgorgement Statute protects. "When endorsed by the Delaware Supreme Court, the federal zone-of-interests test was a prudential and plaintiff-friendly aspect of standing doctrine."[49] The test did not require any "indication of [a legislative] purpose to benefit the would-be plaintiff."[50] "The test foreclose[d] suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"[51] As long as the plaintiff's interest had "a plausible relationship to the policies underlying" the statute, then the plaintiff could sue.[52]

The Supreme Court of the United States has since changed the zone of interests inquiry for purposes of federal standing doctrine, but the Delaware Supreme Court has not followed suit. The framework that the Delaware Supreme Court endorsed continues to govern.[53]

---

[49] *In re Del. Pub. Schs. Litig.*, 239 A.3d 451, 517 (Del. Ch. 2020).

[50] *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)).

[51] *Patchak*, 567 U.S. at 225 (quoting *Clarke*, 479 U.S. at 399).

[52] *Clarke*, 479 U.S. at 403.

[53] *See generally Del. Pub. Schs. Litig.*, 239 A.3d at 517–19.

The Estate has asserted a claim against the Trustees under the Disgorgement Statute. The Estate is precisely the type of plaintiff that the provision seeks to protect. The Estate therefore has constitutional standing to sue.

### 2. Entity Law Standing

The Trustees next contend that the Estate lacks standing to sue them under the Delaware Statutory Trust Act because the Estate does not own—directly or indirectly—a beneficiary interest in the trust. That argument amounts to a contention that a trust's status as a jural person protects the trustee from suit. That argument fails when invoked to defend the Trustees' involvement with a STOLI transaction that is inferably illegal.

A Delaware statutory trust is a jural entity that has a separate legal existence.[54] Like other jural entities, "a statutory trust may be sued for debts and other obligations or liabilities contracted or incurred by the trustees or other authorized persons."[55] By default, a trustee is not liable for the trust's obligations simply by virtue of acting as a trustee. The statute provides:

> Except to the extent otherwise provided in the governing instrument of a statutory trust, a trustee, when acting in such capacity, shall not be personally liable to any person other than the statutory trust or a beneficial owner for any act, omission or obligation of the statutory trust or any trustee thereof.[56]

---

[54] *See* 12 *Del. C.* § 3801(i).

[55] 12 *Del. C.* § 3804(a).

[56] 12 *Del. C.* § 3803(b).

None of the pertinent trust instruments "otherwise provided."

At the pleadings stage, however, it is reasonably conceivable that the Trustees cannot invoke the trusts' separate jural existence for protection. Like other Delaware entities, Delaware statutory trusts are only authorized "to carry on any lawful business or activity."[57] "A trust is invalid if it is created for a consideration which is illegal. The concept has been extended to instances where a violation of public policy is found."[58] A statutory trust therefore must have a lawful purpose and operate in accordance with Delaware law.[59] The same is true for a common-law trust created under Delaware law.[60] As a matter of blackletter law, "[a]n intended trust or trust provision is invalid if: (a) its purpose is unlawful or its performance calls for the commission of a criminal or tortious act; (b) it violates rules relating to perpetuities; or (c) it is contrary to public policy."[61]

---

[57] 12 *Del. C.* § 3801(i)(1).

[58] *Fixman v. Diversified Indus., Inc.*, 1975 WL 1947, at *10 (Del. Ch. May 5, 1975) (citation omitted).

[59] *See In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) ("Delaware law does not charter law breakers."); *accord Lebanon Cty. Emps.' Ret. Fund v. Collis*, 311 A.3d 773, 795 (Del. 2023).

[60] *See Fixman*, 1975 WL 1947, at *7 (emphasizing the importance of "the express statutory phrase 'which is not otherwise illegal' and its suggestion of overriding public policies in the case of an illegal purpose" which serve to prohibit the formation of trusts founded upon an unlawful purpose).

[61] Restatement (Third) of Trusts § 29 (2003); *accord* Restatement (Second) of Trusts § 59 (1959) (explaining that trusts may only "be created for any purpose which is not illegal."); *id*. § 60 ("An intended trust or a provision in the terms of a trust is invalid if illegal."); *id*. § 62 ("A trust or a provision in the terms of a trust is invalid if the enforcement of the trust or provision would be against public policy, even though

The Trustees also cannot rely on the trusts' separate jural existence because they participated directly in the trusts' corporate act.[62] "[I]t is generally held that a trustee is personally liable for all torts committed by him or by agents and servants employed by him in the execution of the trust."[63] Here, the Complaint contains well-pled allegations that the defendants used the Insurance Trust and Trust C-3 to carry out a STOLI scheme. WSFS, as trustee of the Insurance Trust, and the Wells Fargo Defendants, as the trustees of Trust C-2 and Trust C-3, cannot invoke the protections of the Delaware Statutory Trust Act at this stage.

The Trustees argue that ignoring their separate entity status would be equivalent to cancelling the trusts. As they point out, the Delaware Statutory Trust Act authorizes the Court of Chancery to cancel the certificate of trust of any statutory trust for abuse or misuse of its statutory trust powers, privileges, or existence only "[u]pon motion by the Attorney General."[64]

---

its performance does not involve the commission of a criminal or tortious act by the trustee.").

[62] *See Carney v. B & B Serv. Co.*, 2021 WL 1250474, at \*4 (Del. Super. Ct. Apr. 5, 2021); *accord Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 60 (Del. Ch. 2015); *Sens Mech., Inc. v. Dewey Beach Enters., Inc.*, 2015 WL 4498900, at \*4–5 (Del. Super. Ct. June 23, 2015); *Ayers v. Quillen*, 2004 WL 1965866, at \*2 (Del. Super. Ct. June 30, 2004) ("[C]orporate officers and directors in Delaware may be liable for their active participation in tortious conduct even if they are officially acting for the corporation.").

[63] *Franks v. Del-Mar-Va Council, Inc.*, 352 A.2d 768, 770 (Del. Super. Ct. 1976).

[64] 12 *Del. C.* § 3824(a).

31

The Estate's argument is inaccurate. Even if the court eventually disregards the trusts' separate jural existence for the limited purpose of allowing the Estate to recover under the Disgorgement Statute, that is not the same as cancellation. The court's judgment would not terminate or disregard the trusts' existence for all purposes. The judgment only would permit the Estate to recover under the Disgorgement Statute. In any event, any judgment would only be entered at the end of the case. Siding with the Estate at this stage only means that the Estate can proceed with its claim under the Disgorgement Statute. That is a far cry from cancellation.

### 3. The Statute Of Limitations Defense

All the defendants argue that Counts I, II, and III cannot proceed because the claims are untimely. Those counts are dismissed on that basis.

The Court of Chancery uses two conceptual frameworks to analyze timeliness: the statute of limitations and the doctrine of laches.[65] Before the Delaware Supreme Court's decision in *Estate of Frank*, reasonable minds could disagree over whether any timeliness bar applied to a claim under the Disgorgement Statute, as well as what the governing (or analogous) statute of limitations could be. In *Estate of Frank*, the Delaware Supreme Court held that a claim under the Disgorgement Statute is an

---

[65] *See Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 7 (Del. 2009) ("Both the doctrine of laches and statutes of limitations function as time bars to lawsuits.").

"action based on a statute" and thus subject to a three-year limitations period under 10 *Del. C.* § 8106(a).[66]

The next question is when the claim accrued. The limitations period runs from that date. "[F]or contract claims, the wrongful act occurs at the time a contract is breached."[67] "For tort claims, … the wrongful act occurs at the time of injury."[68] For purposes of accrual, the plaintiff need not have suffered quantifiable harm, even if pleading damages is an element of the cause of action.[69]

The defendants hint that the Estate's claims may have accrued in 2006 when the Policy was issued, but they focus on two dates in April 2019. WSFS argues for April 4, the date that the Insurance Trust received the Death Benefit. The Wells Fargo Defendants and the Apollo Defendants argue for April 12, the date when Trust

---

[66] *GWG DLP Master Tr. Dated 03/01/06 v. Est. of Frank*, 2026 WL 439377, at *3 (Del. Feb. 11, 2026). s not dispute that under *Estate of Frank* a claim under the Disgorgement Statute is subject to a three-year statute of limitations. The Estate instead contends that "because of the *sui generis* nature of human-life wagering and Delaware's public policy against STOLI, this Court may hold that, under the particular facts of this case, Defendants cannot invoke Section 8106(a)." Plaintiff's Supp. RB at 4. According to the Estate, the court has discretion to hold that the three-year statute of limitations does not apply. The Estate's argument amounts to asking this court to ignore the Delaware Supreme Court's decision in *Estate of Frank*. This court must follow binding Delaware Supreme Court precedent.

[67] *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 732 (Del. 2020).

[68] *Id.*

[69] *See id.* at 735 ("Under the Delaware occurrence rule, injury is distinct from damages. The statute of limitations can start to run before any 'actual or substantial damages' occur.") (citation omitted).

C-3 received the Death Benefit. The difference is insignificant. The Estate did not file this action until April 26, 2024, so either date would render the claims untimely.

The Estate argues that its claims under the Disgorgement Statute "did not accrue until at least January 2024 as a result of Defendants' fraudulent concealment."[70] That is not an argument for a latter accrual date, but that tolling should apply because the defendants engaged in acts of fraudulent concealment. The Estate also argues that the statute of limitations should be suspended under the doctrine of equitable tolling. And the Estate claims extraordinary circumstances under *IAC*.[71] None of those doctrines applies.

### a.     Fraudulent Concealment

To defeat the statute of limitations defense, the Estate argues for fraudulent concealment. That doctrine cannot help the Estate because the Estate waited too long to sue after receiving inquiry notice.

"Under the doctrine of fraudulent concealment, a statute of limitations … can be 'disregarded when a defendant has fraudulently concealed from a plaintiff the facts necessary to put [the plaintiff] on notice of the truth.'"[72] For tolling to apply, "a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff

---

[70] AB at 67.

[71] *See IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177–78 (Del. 2011).

[72] *LGM Hldgs., LLC v. Schurder*, 340 A.3d 1134, 1146 (Del. 2025) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007)) (alteration in original).

34

away from the truth."[73] "The rationale for this doctrine is to disallow a defendant from taking advantage of his own wrong in preventing a plaintiff from [filing] a timely suit in the courts."[74]

Under Delaware law, inquiry notice universally limits tolling doctrines.[75] A plaintiff cannot invoke tolling doctrines to push the timeliness period beyond the point when the plaintiff "was objectively aware, or should have been aware, of facts giving rise to the wrong."[76] "Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled."[77] "Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury."[78] Put differently, "[i]nquiry notice does not require a plaintiff to have actual knowledge of

---

[73] *Tyson Foods*, 919 A.2d at 585 (citing *Ewing v. Beck*, 520 A.2d 653, 667 (Del. 1987)).

[74] *Allen v. Layton*, 235 A.2d 261, 265 (Del. Super. Ct. 1967), *aff'd*, 246 A.2d 794 (Del. 1968).

[75] *See Collis*, 287 A.3d at 1212.

[76] *Tyson Foods*, 919 A.2d at 585.

[77] *Id*.

[78] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 96 (Del. Ch. 2023) (quoting *Pomeranz v. Museum P'rs, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005)).

a wrong, but simply an objective awareness of the facts giving rise to the wrong—that is, a plaintiff is put on inquiry notice when he gains possession of facts sufficient to make him suspicious, or that ought to make him suspicious."[79] "Once the plaintiff is aware of the injury, or should have discovered it in the exercise of reasonable diligence, then the period for bringing a claim starts to run."[80]

The Complaint acknowledges that in September 2020, the Insurance Trust produced a Beneficial Interest Transfer Agreement revealing that the Life Settlement Company assigned the beneficiary interest in the Insurance Trust to Trust C-3. The Complaint further acknowledges that "the Estate suspected that the [Insurance] Trust had transferred the Policy's death benefit to Trust C-3, and that Trust C-3, as the beneficiary of the [Insurance] Trust, was in possession of the proceeds and would be the entity that would ultimately satisfy any judgment in favor of the Estate."[81] In October 2020, the Estate issued a subpoena to Trust C-3. The Estate sought to add Trust C-3 as a defendant in the Superior Court Action in January 2021, at which point the Estate learned that "Trust C-3 was no longer in existence and had actually dissolved in late January 2020."[82] Also in January 2020, counsel for the Estate informed Wells Fargo Bank that the Estate intended to sue.

---

[79] *Id.* (citing *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *7 (Del. Ch. Jan. 27, 2010)).

[80] *Collis*, 287 A.3d at 1212.

[81] Compl. ¶ 71.

[82] *Id.* ¶ 72.

After learning that Trust C-3 had dissolved, the Estate served non-party subpoenas on the Fund Manager and Apollo Management in February 2021. The Estate thus knew enough at that point to pursue Apollo Global and its affiliates, but after the Fund Manager and Apollo Management objected to the subpoenas, the Estate did not move to enforce them.

The Estate contends that the doctrine of fraudulent concealment should toll the statute of limitations "until at least April 27, 2021, because prior to that date the Estate did not (and could not) identify potential recipients of the death benefit after Trust C-3."[83] The Estate's decision to serve subpoenas on the Fund Manager and Apollo Management shows that the Estate had the ability to seek the necessary information. Regardless, "a plaintiff is put on inquiry notice when he gains possession of facts sufficient to make him suspicious."[84]

The Estate was on inquiry notice by February 2021. After a party is on inquiry notice, the party must sue within a reasonable time or the claim will be barred. Put differently, "[o]nce a plaintiff is on notice of facts that ought to make her suspect wrongdoing, she is obliged to diligently investigate and to file within the limitations period as measured from that time."[85] "Even where the alleged wrongdoer is a fiduciary to the plaintiff, the plaintiff is 'not entitled to sit idly by, blindly relying on

---

[83] Plaintiff's Supp. OB at 4.

[84] *Walton*, 294 A.3d at 96.

[85] *Pomeranz*, 2005 WL 217039, at *13.

37

defendants' assurances, when the documents and disclosures plaintiffs received [] were so suggestive of mismanagement.'"[86] Even "the trusting plaintiff still must be reasonably attentive to his interests.'"[87]

Despite being on inquiry notice, the Estate did not file this action until April 2024, more than three years later. That is not a reasonable time to wait before filing suit, rendering the Estate's reliance on fraudulent concealment ineffective.

### b. Equitable Tolling

The Estate next invokes equitable tolling. That doctrine "stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary."[88] The complaint does not allege facts that would support a fiduciary relationship between the defendants and the Estate, so the doctrine does not apply.

### c. Extraordinary Circumstances

The Estate last contends that "unusual conditions and extraordinary circumstances" exist that support tolling of the statute of limitations, invoking the Delaware Supreme Court's opinion in *IAC*. None exists here.

---

[86] *Murray v. Rolquin*, 2023 WL 2421687, at *12 (Del. Ch. Mar. 9, 2023) (quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *9 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE)).

[87] *Dean Witter*, 1998 WL 442456, at *9.

[88] *Tyson Foods*, 919 A.2d at 585.

38

"There is no precise definition of what constitutes unusual conditions or extraordinary circumstances. The Court of Chancery must exercise its discretion, after considering all relevant facts."[89] *IAC* identified five factors for consideration:

(1)     Whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired;

(2)     Whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances;

(3)     Whether the delay in filing suit was attributable to a legal determination in another jurisdiction;

(4)     The extent to which the defendant was aware of, or participated in, any prior proceedings; and

(5)     Whether, at the time this litigation was filed, there was a bona fide dispute over the validity of the claim.[90]

Those factors are not exclusive.

More recently, the Delaware Supreme Court has explained that

[t]he "unusual conditions and extraordinary circumstances" discussed in our cases tend to focus on whether the plaintiff had been pursuing the claim during the relevant limitations period and whether there were extraneous factors such as a material change in the plaintiff's personal or financial circumstances or ongoing legal proceedings in other jurisdictions that prevented the plaintiff from bringing suit within the limitations period.[91]

---

[89] *IAC*, 26 A.3d at 178.

[90] *Id.*

[91] *Moelis & Co. v. W. Palm Beach Firefighters' Pension Fund*, 2026 WL 184868, at \*16 (Del. Jan. 20, 2026) (citing *IAC*, 26 A.3d at 178).

That summary accurately describes the events in *IAC* and in *Levey*, a later case in which the Delaware Supreme Court held that the plaintiff met the *IAC* test.[92]

The Estate contends that "extraordinary circumstances" exist because "the Estate was 'actively misled' into litigating solely against the [Insurance] Trust in the Superior Court Action."[93] According to the Estate, it "reasonably believed—and had no reason to question—that the [Insurance] Trust either still had the liquidity to pay its legal fees between March 2020 and January 2024, or was indemnified in connection with the Estate's 2704(b) claim."[94] The Estate also relies on the Insurance Trust's conduct during the New York Action and Superior Court Action, as well as how long it took the Superior Court to rule on the Estate's summary judgment motion.

None of those arguments excuses the Estate's delay. Unlike in *IAC* and *Levey*, the Estate does not contend that it experienced a "material change" to its "personal or financial circumstances." There also were no "ongoing legal proceedings in other jurisdictions that prevented the plaintiff from bringing suit within the limitations period." The New York Action was quickly dismissed, and the Estate could have amended the Superior Court Action to add the defendants. The Estate points to how long the Delaware Superior Court took to adjudicate the Estate's motion for summary

---

[92] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 770 (Del. 2013).

[93] Plaintiff's Supp. OB at 6.

[94] *Id.* at 6–7.

judgment, but that pending motion against the Insurance Trust did not prevent the Estate from adding other defendants and asserting claims against them.

The Estate also argues that only more recently did it obtain information indicating that suing other parties would become necessary and who those defendants might be. The Estate contrasts the information it possesses now with what it previously lacked. For purposes of the statute of limitations inquiry, the dispositive consideration is not what the Estate knows now, but when the Estate was on inquiry notice.

First, the Estate observes in January 2024, "following entry of final judgment in the Estate's favor by the Superior Court, that the Insurance Trust revealed for the first time that it was judgment proof."[95] But the Estate was on inquiry notice that the Insurance Trust transferred the Death Benefit long before January 2024. The Complaint acknowledges that "the Estate suspected that the [Insurance] Trust had transferred the Policy's death benefit to Trust C-3, and that Trust C-3, as the beneficiary of the [Insurance] Trust, was in possession of the proceeds and would be the entity that would ultimately satisfy any judgment in favor of the Estate."[96] In January 2021, the Insurance Trust produced a wire transfer form evidencing the transfer of the Death Benefit from the Insurance Trust to Trust C-3. At that point,

---

[95] *Id.* at 4.

[96] Compl. ¶ 71.

41

the Estate should have at least suspected that the Insurance Trust no longer possessed the funds to satisfy a judgment.

Second, the Estate argues that "it was not until March 22, 2024, that Apollo made a limited production of documents that had been fraudulently withheld in response to the Estate's February 2021 subpoenas to Apollo and which revealed Defendants' relations to the [Insurance] Trust, the Policy, and the fraudulent transfers of the death benefit."[97] But the Estate knew enough to serve non-party subpoenas on the Fund Manager and Apollo Management in February 2021. The Fund Manager and Apollo Management objected to the subpoenas, but the Estate did not move to enforce them. Had the Estate done so, it could have discovered that the defendants were involved in the underlying STOLI scheme. Indeed, when the Estate eventually moved to enforce the subpoenas in aid of execution, the Apollo Defendants produced the Termination Agreement.

The actual cause of the Estate's current predicament is its tactical decision not to enforce the non-party subpoenas served on the Fund Manager and Apollo Management in February 2021. At that point, the Estate was on inquiry notice of its claims under the Disgorgement Statute and was seeking information to pursue them. Yet the Estate decided not to enforce the subpoenas and did not re-evaluate that decision until after the Insurance Trust failed to pay the judgment. The Estate waited too long after it was on inquiry notice—more than three years—before filing this

---

[97] Plaintiff's Supp. OB at 5.

action. This case is not one in which unusual conditions or extraordinary circumstances merit granting relief from the statute of limitations.

### 4. The Conclusion Regarding The Statute Of Limitations

Taken as a whole, the Complaint's allegations and documents incorporated by reference demonstrate that the Estate was on inquiry notice of its claims under the Disgorgement Statute against the defendants by February 2021. The Estate failed to sue within a reasonable time. Counts I, II, and III of the Complaint are dismissed on that basis.

### B. Count VI: The Fraudulent Transfer Claim

The Estate next asserts a fraudulent transfer claim against the defendants. That claim is also untimely.

The Estate asserts claims for both constructive and actual fraudulent transfers. A claim for a constructive fraudulent transfer must be brought "within 4 years after the transfer was made."[98] A claim for an actual fraudulent transfer must be brought "within 4 years after the transfer was made … or, if later, within 1 year after the transfer … was or could reasonably have been discovered by the claimant."[99] "The plain language of section 1309 does not allow this Court to permit 'equitable tolling' over and above the tolling period explicitly contained in the statute."[100]

---

[98] 6 *Del. C.* § 1309(2).

[99] 6 *Del. C.* § 1309(1).

[100] *Pereyron v. Leon Constantin Consulting, Inc.*, 2004 WL 1043724, at *2 (Del. Ch. Apr. 29, 2004).

The Estate challenges transfers in April 2019. On April 12, 2019, Trust C-3 instructed WSFS to deposit the Death Benefit into a Wells Fargo Bank account. On April 18, WSFS wired the Death Benefit to that account. On April 24, Wells Fargo Bank wired the Death Benefit to a JPMorgan bank account in the name of the Investment Fund.

The Estate did not file this action until April 2024, more than four years later. The Estate's claim for a constructive fraudulent transfer is therefore untimely.

The Estate's claim for an actual fraudulent transfer is untimely under the same four-year statute, but timely if brought "within 1 year after the transfer … was or could reasonably have been discovered by the claimant."[101] Here, the Estate was on inquiry notice of the challenged transfer from the Insurance Trust to Trust C-3 no later than the Insurance Trust's document production in January 2021, which included a wire transfer form evidencing the transfer. Any claim based on the transfer from the Insurance Trust to Trust C-3 is therefore untimely and barred.

The Estate was also on inquiry notice about a subsequent transfer from Trust C-3 in January 2021, when counsel for the Insurance Trust informed the Estate that Trust C-3 dissolved in January 2020. As of that point, the subsequent transfer "could reasonably have been discovered by the" Estate.[102] Demonstrating that it was on notice, the Estate served subpoenas on the Fund Manager and Apollo Management

---

[101] 6 *Del. C.* § 1309(1).

[102] *Id.*

in February 2021. The Estate did not discover the subsequent transfer at the time because it chose not to enforce the subpoenas.

Accordingly, Count VI is dismissed.

## C.  Count VII: The Fraud Claim

Count VII asserts a fraud claim against all defendants. The Estate contends that the defendants "collectively acted to fraudulently conceal and mislead the Estate from discovering that the [Insurance] Trust was insolvent during the pendency of the Superior Court Action and, thus judgment proof."[103] According to the Estate, if it "had known that it could not recover the proceeds of the Policy's death benefit from the [Insurance] Trust," then the Estate "would have pursued claims against additional parties in the Superior Court Action," including the Investment Fund, the Trustees, the Apollo Defendants, and "other downstream beneficiaries of the death benefit that are still unknown and actively concealed from the Estate."[104]

The fraud claim is thus a fallback claim. If the Estate cannot recover on its other theories, then it should be able to recover in fraud because the defendants defrauded the Estate into not pursuing its other theories. Through this logic, the Estate seeks to turn allegations that might support fraudulent concealment and toll the statute of limitations into an affirmative claim.

[103] Compl. ¶ 275.

[104] *Id.*

45

On the pled facts, the Estate cannot achieve that feat. "[F]alse representations that cover up" an underlying wrong "might have relevance for the vitality of the underlying claim—such as by defeating an argument that a stockholder vote cleansed any breach of fiduciary duty or by tolling a statute of limitations—but it would not give rise to a separate claim for fraud."[105]

The Estate contends that "Defendants collectively acted to fraudulently conceal and mislead the Estate from discovering that the [Insurance] Trust was insolvent during the pendency of the Superior Court Action and, thus judgment proof."[106] The Estate further contends that "Defendants' actions were orchestrated … to allow Defendants to argue (as they do now) that the Estate's claims against them have expired."[107] The Estate relies on the same underlying actions to establish its fraud claim and start a new limitations period. The Estate can argue that its allegations of fraudulent concealment should toll the limitations period, as it has done, but it cannot assert those same allegations as a separate fraud claim.

Accordingly, Count VII is dismissed.

---

[105] *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 212 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE).

[106] Compl. ¶ 275.

[107] *Id.* ¶ 277.

46

**D.    Count IV: The Improper Dissolution Claim**

Count IV of the Complaint asserts a claim against the Wells Fargo Defendants

for improper dissolution under 12 *Del. C.* § 3808(e). That claim is not untimely and

can proceed.

The Delaware Statutory Trust Act contains the following language addressing

a statutory trust's obligations in dissolution:

> A statutory trust which has dissolved shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured claims and obligations, known to the statutory trust and all claims and obligations which are known to the statutory trust but for which the identity of the claimant is unknown and claims and obligations that have not been made known to the statutory trust or that have not arisen but that, based on the facts known to the statutory trust, are likely to arise or to become known to the statutory trust within 10 years after the date of dissolution. If there are sufficient assets, such claims and obligations shall be paid in full and any such provision for payment shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor. Unless otherwise provided in the governing instrument of a statutory trust, any remaining assets shall be distributed to the beneficial owners.[108]

In short, the trust must pay or make provision for claims and obligations before

making distributions to its beneficiary interest holders.

Section 3808(e) of the Delaware Statutory Trust Act addresses a trustee's

liability for failing to cause a trust to "pay or make reasonable provision to pay all

claims and obligations." The pertinent language provides:

> Any person, including any trustee, who under the governing instrument of the statutory trust is responsible for winding up a statutory trust's

---

[108] 12 *Del. C.* § 3808(e).

affairs who has complied with this subsection shall not be personally liable to the claimants of the dissolved statutory trust by reason of such person's actions in winding up the statutory trust.[109]

The statute thus expressly addresses when a trustee is not liable but is silent about when a trustee is liable.

That does not mean a trustee is not liable for an improper distribution. The maxim *expressio unius est exclusio alterius* is "[a] cannon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative."[110] The Delaware Supreme Court has relied on the doctrine when interpreting statutes.[111] "As the maxim is applied to statutory interpretation, where a form of conduct, the manner of its performance and operation, and the persons and things to which it refers are affirmatively or negatively designated, there is an inference that all omissions were intended by the legislature."[112]

Under that canon, Section 3808(e) contemplates that a trustee is generally personally liable for failing to comply with the statutory dissolution requirements. If a trustee fails to pay or make reasonable provision to pay all claims and obligations as required by Section 3808(e), then the trustee can be personally liable to claimants against the trust. That interpretation comports with corporate law, where authorities

---

[109] *Id.*

[110] *Expressio Unius Est Exclusio Alterius*, Black's Law Dictionary (12th ed. 2024).

[111] *See, e.g.*, *Salzberg v. Sciabacucchi*, 227 A.3d 102, 120 (Del. 2020).

[112] *Leatherby v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) (citation omitted).

held (albeit not universally) that the directors of a corporation who conducted a liquidation could be liable for distributing amounts to equity holders without making adequate provision for claims.[113]

The Complaint alleges that Trust C-2 and Trust C-3 were dissolved without making provision for the Estate's claim under the Disgorgement Statute. The Complaint alleges that the Wells Fargo Defendants knew of the Estate's claim under the Disgorgement Statute to the Death Benefit, yet failed to provide for it before distributing the entire Death Benefit. Those allegations state a claim for relief under Section 3808(e).

### 1. The Timeliness Defense

The Wells Fargo Defendants argue in response that a three-year statute of limitations bars the Estate's claim. The dissolutions took place in January 2020, so according to the Wells Fargo Defendants, the Estate had to sue by January 2023. Tolling doctrine and inquiry notice again come into play. Ultimately, neither a statute of limitations nor laches bars the Estate's claim.

---

[113] *E.g.*, *In re Altaba, Inc.*, 241 A.3d 768, 774 (Del. Ch. 2020) (describing traditional corporate law risk that corporate claimants might be able to recover from directors personally if the claimants could prove that the directors made distributions in violation of a duty owed to the corporation's creditors); *In re Transamerica Airlines, Inc.*, 2006 WL 587846, at \*7 (Del. Ch. Feb. 28, 2006) (same); *In re RegO Co.*, 623 A.2d 92, 95–96 (Del. Ch. 1992) (same); 15A William M. Fletcher, Cyclopedia of the Law of Corporations § 7369 (2006) (explaining the trust fund doctrine has been applied to hold directors of a dissolved corporation liable for the debts of the corporation when the directors made improper distributions to equity holders without paying or making provision for corporate claims).

### a. No Statute Of Limitations

No court has ruled on the statute of limitations that applies to a claim under Section 3808. The Delaware Supreme Court has addressed analogous corporate claims.[114] This court "often looks to analogies in the corporate law for guidance on similar issues involving alternative business entities."[115]

Subchapter X of the Delaware General Corporation Law ("DGCL") governs the dissolution and winding up of a Delaware corporation. Section 281(b) establishes the steps involved in winding up a dissolved corporation that has not elected to follow the special court-supervised procedure contemplated by Section 280.[116] Section 281(b) requires that the dissolved corporation or successor entity

> adopt a plan of distribution pursuant to which the dissolved corporation or successor entity (i) shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured contractual claims known to the corporation or such successor entity, (ii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party and (iii) shall make such provision as will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 10 years after the date of dissolution. The plan of distribution shall provide that such claims shall be paid in full and any such provision for payment made shall be made in full if there are sufficient assets. If there are insufficient assets, such plan shall provide

---

[114] *See In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 705–07 (Del. 2013).

[115] *Cantor Fitzgerald v. Chandler*, 1999 WL 1022065, at *4 (Del. Ch. Oct. 14, 1999).

[116] 8 *Del. C.* § 281(b).

that such claims and obligations shall be paid or provided for according to their priority and, among claims of equal priority, ratably to the extent of assets legally available therefor. Any remaining assets shall be distributed to the stockholders of the dissolved corporation.[117]

Section 281(c) of the DGCL provides that "[d]irectors of a dissolved corporation or governing persons of a successor entity which has complied with subsection (a) or (b) of this section shall not be personally liable to the claimants of the dissolved corporation."[118]

Sections 281(b) and (c) thus establish the same basic winding up procedure for corporations that Section 3808 establishes for a Delaware statutory trust. In *Krafft-Murphy*, the Delaware Supreme Court held that "no statutory provision governing corporate dissolution operates to extinguish the Corporation's potential liability to third parties by time-barring those parties' claims."[119] The court reasoned Section 281(b) to "require a dissolved corporation to set aside assets for the payment of claims against the corporation that may arise or become known five to ten years after dissolution," which demonstrated that the "'legislature intended to recognize the potential for corporate liability based on claims asserted … five to ten years after dissolution.'"[120] At the same time, "the five and ten year claims planning periods were

---

[117] *Id.*

[118] 8 *Del. C.* § 281(c).

[119] *Krafft-Murphy*, 82 A.3d at 705.

[120] *Id.*

not intended to operate as general statutes of limitation."[121] As the court concluded, if the General Assembly intended those periods or a shorter period to bar claims against a dissolved corporation, then the legislature would have said so.[122]

*Krafft-Murphy* serves as persuasive authority for interpreting Section 3808(e). No statute of limitations applies to claims under that provision.

### b. No Laches Problem

Laches also does not bar the Estate's Section 3808(e) claim. Section 3808(e) contemplates that claims may arise up to ten years after dissolution, and as discussed in the prior section, even that time period does not operate as a hard cutoff. Here, the Wells Fargo Defendants failed to make provision for a claim that was likely to be asserted within that statutory period. The Estate can pursue the Wells Fargo Defendants for dissolving Trust C-2 and Trust C-3 without making provision for a claim under the Disgorgement Statute.

"Where no analogous limitations period exists, the legal statute of limitations cannot apply by analogy, and instead the Court relies entirely on the traditional principles of laches."[123] "Laches is an affirmative defense that the plaintiff unreasonably delayed in bringing suit after learning of an infringement of his or her

---

[121] *Id.* at 707.

[122] *See id.*

[123] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 979 (Del. Ch. 2016) (citation modified).

52

rights."[124] The doctrine is "rooted in the maxim that equity aids the vigilant, not those who slumber on their rights."[125] "Laches consists of two elements: (i) unreasonable delay in bringing a claim by a plaintiff with knowledge thereof, and (ii) resulting prejudice to the defendant."[126] When applying the doctrine of laches, "[w]hat constitutes unreasonable delay and prejudice are questions of fact that depend upon the totality of the circumstances."[127]

What counts as unreasonable delay depends on the nature of the claim. Section 3808(e) seeks to ensure that a party responsible for dissolving and winding up a trust makes provision for "all contingent, conditional or unmatured claims and obligations, known to the statutory trust," as well as for "claims and obligations that have not been made known to the statutory trust … but that, based on the facts known to the statutory trust, are likely to … become known to the statutory trust within 10 years after the date of dissolution."[128]

The Complaint supports a reasonably conceivable inference that when the Wells Fargo Defendants dissolved Trust C-2 and Trust C-3 in January 2020, they knew or should have known that the Estate did not receive the Death Benefit and

[124] *Levey*, 76 A.3d at 769.

[125] *Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982).

[126] *Levey*, 76 A.3d at 769.

[127] *Hudak v. Procek*, 806 A.2d 140, 153 (Del. 2002).

[128] 12 *Del. C.* § 3808(e).

therefore had a claim under the Disgorgement Statute. That claim arose when the insurer paid the Death Benefit to the Insurance Trust rather than to the Estate. Although the Estate had not made its claim known to the statutory trusts, a claim was likely to become known within ten years after dissolution.

The Wells Fargo Defendants argue that they started the dissolution process in late December 2019, at which point there was no reason for them to know about the claim under the Disgorgement Statute. At the pleadings stage, the Wells Fargo Defendants are not entitled to that defense-friendly inference. As repeat players in the STOLI game, they inferably knew that the Estate had a claim under the Disgorgement Statute as soon as the Insurance Trust received the Death Benefit and distributed it up to Trust C-3. At that point, the Wells Fargo Defendants knew that the Estate did not receive the Death Benefit, giving rise to a claim under the Disgorgement Statute.

The Wells Fargo Defendants therefore had to make provision for the claim. Under Section 3808(e), "[i]f there are sufficient assets, … any such provision for payment shall be made in full."[129] The statute required that the Wells Fargo Defendants retain the entire Death Benefit as a provision for the claim under the Disgorgement Statute. Instead, they distributed the Death Benefit up the line to the Apollo Defendants, leaving the trusts insolvent.

---

[129] *Id.*

Trust C-2 and Trust C-3 dissolved in January 2020. The Estate did not sue until April 2024. That delay is sufficient to bar other claims in the case as untimely, but not a claim under a statute that expressly contemplates the possibility that the claim may become known to the trust within ten years after dissolution. The Estate asserted its claim and made it known to Trust C-2 and Trust C-3 four years after dissolution. Through the letter that the Estate's counsel sent to Wells Fargo Bank in January 2020, the Estate made its claims known to the Wells Fargo Defendants at that time, making it all the more clear that they had an obligation to make provision for the claim under the Disgorgement Statute.

Because the claim is not untimely, the analysis need not reach the issue of prejudice. Even so, the Wells Fargo Defendants cannot establish prejudice at the pleadings stage. The January 2020 letter from the Estate's counsel put the Wells Fargo Defendants on notice of the claim and allowed them to preserve documents and defend themselves. At this stage of the case, it is reasonable to infer that the facts surrounding the Wells Fargo Defendants' statutory non-compliance are likely to be undisputed. The reasons why the Wells Fargo Defendants failed to make provision for the known claim are also likely to be undisputed: The Apollo Defendants told the Wells Fargo Defendants to distribute the Death Benefit and wind up the trusts, and the Wells Fargo Defendants complied. Finding sufficient prejudice to warrant dismissal would require the court to draw defense-friendly inferences.

The Wells Fargo Defendants claim prejudice because they were not afforded the opportunity to participate in the Superior Court Action as defendants, but that

was not prejudicial. The "claim" that the Wells Fargo Defendants did not pay or make reasonable provision to pay during the winding up process arose from the Disgorgement Statute, not the Superior Court Action. Contrary to the Wells Fargo Defendants' arguments, they had ample opportunity "to mount a defense" to the Estate's improper dissolution claim after receiving the Estate's January 2020 letter.

The claim for improper dissolution of Trust C-2 and Trust C-3 is not untimely. It can proceed.

### 2. The Not-Our-Job Defense

The Wells Fargo Defendants also argue that they cannot be liable under Section 3808(e) because they were not in charge of the dissolution process. According to them, they "cannot face Section 3808(e) liability because the 'responsib[ility]' under the Trusts' governing agreements for winding up the Trusts lay solely with beneficiary and Directing Person [the Investment Fund]."[130] At this stage of the proceeding, that argument fails.

Section 3808(e) requires that the statutory trust comply with the requirements for winding up. Section 3806(a) provides that "[e]xcept to the extent otherwise provided in the governing instrument of a statutory trust, the business and affairs of a statutory trust shall be managed by or under the direction of its trustees."[131] By

---

[130] Wells Fargo RB at 19–20.

[131] 12 *Del. C.* § 3806(a).

56

default, therefore, the trustee is responsible for winding up the trust in compliance with Section 3808(e).

> The Delaware Statutory Trust Act authorizes directed trusts:
>
> To the extent provided in the governing instrument of a statutory trust, any person (including a beneficial owner) shall be entitled to direct the trustees or other persons in the management of the statutory trust. Except to the extent otherwise provided in the governing instrument of a statutory trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such person to be a trustee. To the extent provided in the governing instrument of a statutory trust, neither the power to give direction to a trustee or other persons nor the exercise thereof by any person (including a beneficial owner) shall cause such person to have duties (including fiduciary duties) or liabilities relating thereto to the statutory trust or to a beneficial owner thereof.[132]

This provision makes clear that although the governing instrument may authorize any person to give direction to the trustee, the trustee remains responsible for managing the business and affairs of the trust. Good faith reliance on the provision of a trust agreement, including a directed-trustee provision, may provide the trustee with a defense against liability for some types of claims,[133] but the trustee remains responsible for managing the business and affairs of the trust.

---

[132] *Id.*

[133] *See* 12 *Del. C.* § 3806(d) ("Unless otherwise provided in a governing instrument, a trustee or beneficial owner or other person shall not be liable to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument for breach of fiduciary duty for the trustee's or beneficial owner's or other person's good faith reliance on the provisions of the governing instrument."). This defense notably applies to a claim "for breach of fiduciary duty." That is not the claim that the Estate asserts.

The Delaware Statutory Trust Act authorizes a trustee "to delegate to 1 or more persons any or all of the trustee's rights, powers and duties to manage and control the business and affairs of the statutory trust."[134] But the same provision makes clear that "[e]xcept to the extent otherwise provided in the governing instrument of a statutory trust, such delegation by a trustee of a statutory trust shall not cause the trustee to cease to be a trustee of the statutory trust or cause the person to whom any such rights, powers or duties have been delegated to be a trustee of the statutory trust."[135] Good faith reliance on the agent's actions may provide the trustee with a defense against liability,[136] but the trustee remains responsible for managing the business and affairs of the trust.

Consequently, unless the agreements governing Trust C-2 and Trust C-3 provide otherwise, the Wells Fargo Defendants remained responsible for winding up the trusts. The governing agreements each contain a section titled "Dissolution of the Trust." The language is substantively identical, providing

(a)     The Trust shall be dissolved upon written notice thereof provided by the Beneficial Owner to [the] Trustee.

(b)     Upon the dissolution of the Trust pursuant to Section 11(a) hereof and after satisfaction of all liabilities to creditors of the Trust as provided in the Act (as directed by a Directing Person pursuant to a Direction), the [Trustee] shall:

---

[134] 12 *Del. C.* § 3806(i).

[135] *Id.*

[136] *See* 12 *Del. C.* § 3806(k).

(i)     at the Direction of a Directing Person, either liquidate the Trust Assets and distribute the proceeds thereof, or distribute the Trust Assets in kind, to the Beneficial Owner or a designee thereof; and

(ii)    take such other action as may be directed by a Directing Person pursuant to a Direction in connection with the transfer of the Trust Assets or the proceeds thereof to the Beneficial Owner or its designee.

(c)     Upon the dissolution of the Trust pursuant to Section 11(a) and completion of the winding up of the Trust's affairs as set forth in a Direction from a Directing Person, a certificate of cancellation canceling the Certificate of Trust of the Trust shall be filed with the Delaware State Office, which certificate of cancellation shall be executed by [the] Trustee.[137]

This language makes clear that the Wells Fargo Defendants, as trustees, remained responsible for winding up the trusts.

To be sure, the governing agreements entitled a "Directing Person," such as the Investment Fund, to instruct the Wells Fargo Defendants how to act. For example, the agreements provide that the trustees may take certain actions only "after satisfaction of all liabilities to creditors of the Trust as provided in the Act (as directed by a Directing Person pursuant to a Direction)."[138] The agreements also state that the trustees shall not

incur any liability to anyone in acting upon any … Direction … believed by it in good faith to be genuine and believed by it in good faith to be signed by the proper party or parties, and such reliance shall not

---

[137] Wells Fargo OB Exs. 1 § 11, 2 § 11.

[138] *Id.*

constitute negligence or misconduct in connection with the Trustee's handling of funds or otherwise.[139]

For purposes of lawsuits by parties bound by the trust agreement, such as a claim by a beneficiary for breach of fiduciary duty or breach of the trust agreement, that provision offers a powerful defense. But it does not obviously bind a non-party to the trust agreement, such as the Estate.

Nor is it clear at the pleadings stage that the Wells Fargo Defendants have a reliance defense. Reliance requires good faith. For purposes of legal compliance, that means a good-faith belief that the action is legally compliant. "Delaware law does not charter law breakers."[140] As with the corporations that Delaware charters, Delaware only authorizes statutory trusts to pursue "lawful business."[141] The obligation of legal compliance encompasses not only laws external to the entity, but also the laws governing the entity.[142]

---

[139] Wells Fargo OB Exs. 1 § 7(a)(iv), 2 § 7(a)(iv).

[140] *Massey*, 2011 WL 2176479, at *20; *accord Desimone v. Barrows*, 924 A.2d 908, 934–35 (Del. Ch. 2007) ("Delaware corporate law has long been clear on this rather obvious notion; namely, that it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully. The knowing use of illegal means to pursue profit for the corporation is director misconduct.") (citation modified); *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch. 2004) ("Under Delaware law, a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity.").

[141] 12 *Del. C.* § 3801(i).

[142] *Firefighters' Pension Sys. of City of Kansas City v. Found. Bldg. Mat'ls, Inc.*, 318 A.3d 1105, 1182 (Del. Ch. 2024) ("Just as directors could be personally liable for knowingly causing the corporation to violate mine safety regulations, directors could be personally liable for knowingly causing the corporation to violate a section of the

At the pleadings stage, it is reasonable to infer that the Wells Fargo Defendants failed to comply with the laws governing Trust C-2 and Trust C-3 by dissolving the trusts without making any provision for claims under the Disgorgement Statute. It is also reasonably conceivable that the Wells Fargo Defendants could not have believed in good faith that distributing all of the trusts' assets without making any provision for a claim under the Disgorgement Statute was statutorily compliant. The claim for improper dissolution survives pleadings-stage review.

### 3. The No-Recourse Defense

Last, the Wells Fargo Defendants invoke no-recourse provisions in the trust agreements. Those provisions do not limit the Estate's ability to sue because the Estate is not a party to either trust agreement. They also only apply to liabilities of the trusts, and the Section 3808(e) claim is a liability of the trustees, not the trusts. Finally, they cannot insulate the trustees from bad-faith conduct, and at the pleadings stage, it is reasonably conceivable that the Wells Fargo Defendants intentionally violated Section 3808(e) by rendering the trusts insolvent through a statutorily non-compliant winding-up process.

---

DGCL. The source of the statutory mandate is different, but the operative legal framework is the same.") (footnote omitted).

61

A no-recourse provision limits whom a party to a contract can sue.[143] A standard no-recourse provision states that a party cannot sue or recover from the persons identified in the clause, usually under the contract but often—and more importantly—on extra-contractual theories.[144] The latter dimension is more important because if the designated persons are not parties to the contract, then they already cannot be sued for breach of the contract.[145] For breach of contract claims, the no-recourse provision adds a belt to the common law suspenders.[146]

A no-recourse provision functions as a specific type of covenant not to sue. Because covenants not to sue are contractual, their effects cannot extend beyond their terms. Thus, where a no-recourse provision only addressed "payment of the principal of or premium, if any, or interest on any Debenture or for any claim based thereon," the provision by its own terms did not encompass claims that were "not contractual,"

---

[143] *See AmeriMark Interactive, LLC v. AmeriMark Hldgs., LLC*, 2022 WL 16642020, at \*4 (Del. Ch. Nov. 3, 2022).

[144] *See Simons v. Cogan*, 542 A.2d 785, 792 (Del. Ch. 1987), *aff'd*, 549 A.2d 300 (Del. 1988).

[145] *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) ("It is a general principle of contract law that only a party to a contract may be sued for breach of that contract."); *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at \*53 (Del. Ch. May 19, 2020) (same); *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 178 (Del. Ch. 2014) (same).

[146] *See Simons*, 542 A.2d at 792 (explaining that a "standard" no-recourse provision in a bond indenture "provid[es] broadly that liability for breach of any obligation created by the indenture shall not attach to any stockholder, officer or director of the issuer, but such liability shall be limited to the corporation itself").

such as claims for fraud, breach of fiduciary duty under an agency theory, or an attempt to pierce the corporate veil.[147]

But because a no-recourse provision functions as a specific type of covenant not to sue, public policy limits its effects to the same degree.[148] As with covenants not to sue generally, "Delaware public policy will not permit parties to use a no-recourse provision to insulate themselves from fraud."[149] Delaware public policy also does not permit the corporate directors to use a non-recourse provision in a contract governing

---

[147] *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.,* 1988 WL 5492, at *3 (Del. Ch. 1988). The court dismissed the agency claim on its merits. *Id.* at *4. Other Delaware decisions reach similar results. *See Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (following *Mabon* and denying to apply a no-recourse provision to an alter-ego claim because "an alter ego claim is distinct from a contract claim and is equitable in nature" and "the no recourse provision does not bar equitable claims."); *Cont'l Ill. Nat'l. Bank and Tr. Co. of Chi. v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *4-5 (Del. Ch. Feb. 27, 1987) (summarizing case law and concluding that a no-recourse clause does not bar claims for common law fraud).

[148] *See generally New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520 (Del. Ch. 2023) (discussing covenants not to sue and associated public policy limitations).

[149] *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 15035833, at *8 (Del. Ch. Oct. 26, 2022). Delaware law distinguishes between contractual fraud and extra-contractual fraud. "Commentators and courts have generally understood Delaware law to disregard non-recourse clauses where the parties purportedly insulated by those clauses were complicit in contractual fraud." *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *19 (Del. Ch. Aug. 12, 2021). Parties can insulate themselves from extra-contractual fraud, but only through a non-reliance clause. *See Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1058–59 (Del. Ch. 2006). Delaware law does not countenance other contractual methods of limiting extra-contractual fraud. *See P3 Health*, 2022 WL 15035833, at *7 (rejecting reliance on scope-of-representation clause combined with an integration clause limited extra-contractual fraud); *Online HealthNow*, 2021 WL 3557857, at *14 (rejecting reliance on no-recourse clause); *see also New Enter.,* 295 A.3d at 532 (discussing non-reliance alternative in *Abry* and noting that "[s]ubsequent decisions have refused to authorize other types of provisions that could restrict tort liability for intentional harm.").

securities, such as a trust indenture, "to immunize themselves from a future breach of fiduciary duties or fraudulent conduct through a provision in the trust indenture."[150]

Those public policy limitations apply even when the no-recourse provision attempts to sweep in all possible claims. In *Continental Illinois*, then-Vice Chancellor (later Justice) Jacobs addressed an expansive no-recourse provision in a bond indenture that stated:

> No recourse whatsoever, either directly or through the Company or any trustee, receiver or assignee, shall be had in any event or in any manner against any past, present or future stockholder, director or officer of the Company by virtue of any past, present or future constitution, statute or rule of law or equity or by the enforcement of any assessment or penalty or by any legal or equitable proceeding or otherwise for the payment of the principal of or premium or interest on the Debentures or any of them or for any claim based thereon or otherwise in respect to the Debentures or of the Indenture; the Indenture and each of the Debentures being each a corporate obligation only, all individual liability of whatsoever kind or nature of, and all rights and claims against, such stockholders, directors and officers founded in any way directly or indirectly upon the Indenture or the Debentures or growing out of the issue thereof or out of the indebtedness evidenced thereby are expressly waived and released by the acceptance of the Debentures by each of the holders thereof and as a condition of a part of the consideration for the issue thereof and the execution and delivery of the Indenture.[151]

---

[150] *U.S. Bank Nat'l Ass'n v. U.S. Timberlands Klamath Fall, L.L.C.*, 864 A.2d 930, 950–51 (Del. Ch. 2004), *vacated on other grounds*, *U.S. Timberlands Klamath Fall, L.L.C. v. U.S. Bank Nat'l Ass'n*, 875 A.2d 632 (Del. 2005) (TABLE).

[151] *Cont'l Ill.*, 1987 WL 55826, at *4.

After surveying Delaware precedent, Vice Chancellor Jacobs concluded that the provision "does not bar a tort claim against the individual defendants based on fraudulent conduct."[152]

The Wells Fargo Defendants rely on substantively identical no-recourse provisions (jointly, the "No-Recourse Provisions"). The No-Recourse Provision contained in the Trust C-2 trust agreement states:

> No recourse shall ever be had, directly or indirectly, against the Trustee, whether by legal, equitable or other proceeding, in respect of any indebtedness or other liability of the Trust, it being expressly understood and agreed that all indebtedness and other liabilities of the Trust shall be enforceable only against, and be satisfied only out of, the Trust Assets or shall be evidence only of a right to payment out of the Trust Assets, as the case may be.[153]

The Wells Fargo Defendants' reliance on the No-Recourse Provisions fails for two reasons.

---

[152] *Id.*; *accord id.* at *6 ("Based upon the foregoing authorities, I conclude that the 'no recourse' clause involved here … does not operate to bar Continental from maintaining an action for common law fraud."); *Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *9, 11 (Del. Super. Ct. Jan. 13, 2021) (holding that a no-recourse provision that purported to encompass "[a]ll claims or causes of action (whether in contract or in tort, or in law or in equity)" could not defeat a claim for fraud). *See generally* Restatement (Second) of Contracts § 195 (1981), Westlaw (database updated Oct. 2024) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.").

[153] Wells Fargo OB Ex. 2 § 8. The No-Recourse Provision contained in the Trust C-3 trust agreement is substantively identical although it does account for the fact that Trust C-3 had a primary and secondary trustee. Wells Fargo OB Ex. 1 § 8.

65

First, the Estate is not a party to the trust agreements. The parties to the Trust C-2 trust agreement are Wells Fargo Delaware and the Investment Fund.[154] The parties to the Trust C-3 trust agreement are Wells Fargo Bank, Wells Fargo Delaware, the Investment Fund, and Trust C-2.[155] Nor is the Estate's claim for improper dissolution a contract claim that a no-recourse provision could readily defeat. It is a statutory claim for on an alleged violation of Section 3808(e).

Second, even if the No-Recourse Provisions could encompass the Estate's statutory claim, the provisions only extend to "any indebtedness or other liability of the Trust." A failure to comply with Section 3808(e) when winding up and dissolving a trust results in liability for the trustee, not the trust.

Third, even if the No-Recourse Provisions could encompass the Estate's statutory claim, and even it was a liability of the trust, the Complaint alleges facts supporting an inference that it cannot apply. As a matter of Delaware public policy, contract provisions cannot insulate persons from liability for intentional or bad faith acts.[156] The complaint alleges that the Wells Fargo Defendants acted in bad faith by intentionally making no provision for a claim under the Disgorgement Statute,

---

[154] Wells Fargo OB Ex. 2.

[155] Wells Fargo OB Ex. 1.

[156] *See New Enter.*, 295 A.3d at 591–92 (collecting authorities). The lone exception remains that an anti-reliance clause can eliminate a party's ability to sue for fraud based on extra-contractual representations. *See Abry P'rs*, 891 A.2d at 1058–59.

despite knowing of its existence. As a matter of Delaware public policy, the No-Recourse Provisions cannot bar liability for bad faith acts.

The No-Recourse Provisions do not defeat Count IV.

### III. CONCLUSION

The defendants' motions to dismiss are granted in part. No one sought dismissal of Count V. Both Count IV and Count V can proceed past the pleadings stage.